Wachtler, J.
(dissenting in part). Insofar as this opinion relates to the case of Becker v Schwartz, I agree with the majority that the suit for "wrongful life” brought on behalf of the infant should be dismissed. I would, however, also dismiss the parents’ collateral suit for the expense of rearing an unwanted child.
A doctor who provides prenatal care to an expectant mother should not be held liable if the child is born with a genetic defect. Any attempt to find the physician responsible, even to a limited extent, for an injury which the child unquestionably inherited from his parents, requires a distortion or abandon *418 ment of fundamental legal principles and recognition, by the courts, of controversial rights and duties more appropriate for consideration and debate by a legislative body. These problems, which are always present when the child born with a genetic disorder seeks to hold the doctor responsible, are compounded when the parents seek compensation, on their own behalf, for collateral injuries occasioned by emotional distress or the increased cost of caring for a handicapped child.
The heart of the problem in these cases is that the physician cannot be said to have caused the defect. The disorder is genetic and not the result of any injury negligently inflicted by the docto.r. In addition it is incurable and was incurable from the moment of conception. Thus the doctor’s alleged negligent failure to detect it during prenatal examination cannot be considered a cause of the condition by analogy to those cases in which the doctor has failed to make a timely diagnosis of a curable disease. The child’s handicap is an inexorable result of conception and birth.
Nevertheless the plaintiffs, parents and child, urge that the doctor should be held liable for the child’s handicapped life, not because he caused the disorder, but because he is responsible for the child’s birth. The theory is that if the doctor had advised the parents of the risk of bearing a handicapped child, and the availability of tests for detecting the disorder, the mother would have consented to the tests, the tests would have revealed the defect, the parents or at least the mother would have decided to have an abortion, the abortion would have been successfully performed and thus the child would not have been forced to lead a life of hardship. However, since the doctor failed or neglected to advise them of the risk, they claim that they were denied the opportunity to take the additional steps which would have terminated the pregnancy and thus the doctor should be held liable for the birth and the child’s consequent handicapped existence. Even if we assume, as we must on a motion to dismiss the complaint, that the parents would have made all the difficult decisions leading to an abortion — a conclusion which could be certain, if ever, only in retrospect — we must still go to great lengths to find that the doctor’s failure to detect the defect was the cause, indeed the proximate cause, of the child’s handicapped life. And the causal relationship is even more remote when the parents *419 seek to recover for an injury they have suffered as a result of the alleged injury to the child.
But the problems extend beyond causation. There is also the question as to what right the doctor violated and to whom the right belongs. The infant essentially claims that she had a right not to be born when birth would necessarily mean a life of hardship. The majority notes that the damages for violation of such a right would be impossible to assess. But on an even more fundamental level this cause of action must fail because the courts have long refused to recognize that such a right exists (Williams v State of New York, 18 NY2d 481).
"Impossibility of entertaining this suit”, we said in the Williams case (at p 484), "comes not so much from difficulty in measuring the alleged 'damages’ as from” the fact that this "is not a suable wrong that is cognizable in court.” A majority at the Appellate Division apparently felt that this holding was dictated by the fact that abortion was then illegal, an impediment which has now been removed in many cases. That however was not the basis for our determination in Williams. The antiabortion law was not mentioned in the opinion and, in fact, the case did not involve a claim that the plaintiff should have been aborted, but that she should not have been conceived. It was alleged that her mother had been raped while a patient at a State mental institution and the plaintiff sought damages from the State for the social stigma and loss of legal rights that she must suffer as an illegitimate child. We noted that "[i]f the pleaded facts are true, the State was grievously neglectful as to her mother, and as a result the child may have to bear unfair burdens” (Williams v State of New York, supra, at p 484). Nevertheless we refused to recognize a right to be "born under one set of circumstances rather than another” as a "brand new ground for suit” (Williams v State of New York, supra, at pp 483, 484; see, also, Tobin v Grossman, 24 NY2d 609, 614). And of course whether the infant was wrongfully conceived, as in Williams, or could have been legally aborted, as in the case now before us, is of no practical significance. In either event there is no right not to be born, even into a life of hardship, and thus no right cognizable at law which the defendant can be said to have violated.
Since the infant’s suit must be dismissed, the parents’ cause of action for the costs of "special treatment, teaching, care, medical services, aid and assistance throughout the lifetime of *420 the infant” should be dismissed as well. A parent’s right to recover expenses occasioned by an injury to the child "is based upon and arises out of the negligence which causes the injury to the child. The injury to the child results in a two-fold action, one for the father and one for the child” (Psota v Long Is. R. R. Co., 246 NY 388, 395-396; cf. Maxson v Delaware Lackawanna & Western R. R. Co., 112 NY 559; Gray v Brooklyn Hgts. R. R. Co., 175 NY 448). Thus the parents’ suit for the pecuniary losses is derivative; it cannot stand alone (Reilly v Rawleigh, 245 App Div 190; Kotary v Spencer Speedway, 47 AD2d 127; O’Hearn v O’Hearn, 55 AD2d 766; cf. Maxson v Tomek, 244 App Div 604, mot for lv to app den 268 NY 726). If the child cannot establish a good cause of action to recover for its injury, the parents’ suit for collateral losses, flowing from the injury to the child, must also fail (see, e.g., Gleich v Volpe, 32 NY2d 517; Warmsley v Long Is. Banana Co., 35 NY2d 953; see, also, Glendenning v Feld, 285 App Div 604).
The majority, disregarding this principle, has held instead that the doctor owed a duty directly to the parents and thus they may recover, for a violation of their own rights, the special costs of raising the handicapped child. This involves the creation of a completely new tort. It also conflicts with our decision in Howard v Lecher (42 NY2d 109) in which we held that the parents of a child born with a genetic defect could not recover from the doctor for the emotional distress that they had suffered as a result of the child’s birth, even though the defect could have been detected and the pregnancy aborted if the doctor had advised the parents of the risk and the available medical tests. That determination was based on our prior decision in Tobin v Grossman (24 NY2d 609, 611, supra) in which we said: "no cause of action lies for unintentional harm sustained by one, solely as a result of injuries inflicted directly on another”.
The majority’s attempt to distinguish Howard misses the point of the holding. The fact that the damage in the case now before us may be easily ascertained is of no consequence. We did not find that the damages in Howard were impossible to assess, nor did we refer to damages in the opinion. Neither is there any merit to the suggestion that we denied relief in that case solely because the parents sought to recover for mental injury, as opposed to the pecuniary losses requested here. That circumstance was not the controlling factor. Rather it was the indirect nature of the parents’ injury which was found to be *421 dispositive. Thus we rejected the argument made by the plaintiffs and the dissenting Judges that the doctor owed a duty to the mother so that "the injury was inflicted directly upon the individual claiming the harm and the same individual to whom the duty was owed was the one directly injured by the breach” (Howard v Lecher, supra, at p 116 [Cooke, J., dissenting]). Today, little more than a year after Howard was decided, a majority of the court has rejected the basis for the holding and has adopted the dissenting view.
In fact if, as the majority now holds, the doctor did breach a duty directly owed to the parents, there is no longer any reason why they should not be entitled to recover for their emotional suffering as well as the pecuniary loss. Our decision in Johnson v State of New York (37 NY2d 378) is directly in point. In that case the plaintiff brought a claim against the State for emotional harm and pecuniary losses after State hospital employees had negligently misinformed her that her mother had died. After concluding that the plaintiff "was the one to whom a duty was directly owed by the hospital, and the one who was directly injured by the hospital’s breach of that duty” we set aside the Appellate Division’s determination that recovery should be limited to pecuniary losses. We stated at pages 383-384: "not only justice but logic compels the further conclusion that if claimant was entitled to recover her pecuniary losses she was also entitled to recover for the emotional harm caused by the same tortious act. The recovery of the funeral expenses stands only because a duty to claimant was breached. Such a duty existing and such a breach of that duty occurring, she is entitled to recover the proven harmful consequences proximately caused by the breach. In the light of the Battalia [10 NY2d 237] and Ferrara [5 NY2d 16] cases (supra) and the reasoning upon which they are based, recovery for emotional harm to one subjected directly to the tortious act may not be disallowed so long as the evidence is sufficient to show causation and substantiality of the harm suffered, together with a 'guarantee of genuineness’ to which the court referred in the Ferrara case”. Certainly, in the present case, it could not be said that the parents’ claim of emotional suffering is any less genuine than their claim of pecuniary loss.
In addition, although the parents in this case only seek compensation for the special expenses necessary for the care of a handicapped child, there is no logical reason why in other cases, parents should not be entitled to have the doctor also *422 pay the normal costs of supporting the child. After all, if the doctor had not breached his duty, the child would never have been born and the parents would not have been burdened with any of the costs of support.
And there will inevitably be other costs, even more difficult to assess. A doctor exposed to liability of this magnitude will undoubtedly, in marginal cases, be inclined to practice "defensive medicine” by advising abortion rather than run the risk of having to pay for the lifetime care of the child if it is born with a handicap. Thus the majority’s decision will involve human costs as well, in those cases where otherwise healthy children will be unnecessarily aborted as the only alternative to the threat of pecuniary liability.
In sum, by holding the doctor responsible for the birth of a genetically handicapped child, and thus obligated to pay most, if not all, of the costs of lifetime care and support, the court has created a kind of medical paternity suit. It is a tort without precedent, and at variance with existing precedents both old and new. Indeed the members of the majority are divided among themselves as to what principle of law requires the doctor to pay damages in this case. The limits of this new liability cannot be predicated. But if it is to be limited at all it would appear that it can only be confined by drawing arbitrary and artificial boundaries which a majority of the court consider popular or desirable. This alone should be sufficient to indicate that these cases pose a problem which can only be properly resolved by a legislative body, and not by courts of law.
Accordingly, the order of the Appellate Division should be reversed and the third and fourth causes of action dismissed.